# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DARLING INGREDIENTS INC., | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-0614-LWW |
| | ) | |
| GERALD F. SMITH, JR.; GERALD | ) | |
| F. SMITH, JR. GST TRUST; | ) | |
| MICHAEL A. SMITH; MICHAEL | ) | |
| SMITH GST TRUST; J. KEVIN | ) | |
| KING, TRUSTEE UNDER | ) | |
| IRREVOCABLE TRUST | ) | |
| AGREEMENT WITH GERALD F. | ) | |
| SMITH, JR. DATED SEPTEMBER 1, | ) | |
| 2009; WILLIAM GREGORY | ) | |
| SNELLINGS, TRUSTEE FBO | ) | |
| VICTORIA KATHERINE SMITH | ) | |
| UNDER IRREVOCABLE TRUST | ) | |
| AGREEMENT WITH MICHAEL A. | ) | |
| SMITH DATED DECEMBER 17, | ) | |
| 2012; WILLIAM GREGORY | ) | |
| SNELLINGS, TRUSTEE FBO | ) | |
| MITCHELL ALEXANDER SMITH | ) | |
| UNDER IRREVOCABLE TRUST | ) | |
| AGREEMENT WITH MICHAEL A. | ) | |
| SMITH DATED DECEMBER 17, | ) | |
| 2012, | ) | |
| | ) | |
| Defendants and | ) | |
| Counterclaim Plaintiffs. | ) | |

## MEMORANDUM OPINION

Date Submitted:  September 6, 2023
Date Decided:  December 11, 2023

T. Brad Davey & Callan R. Jackson, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Matthew Solum & Jeffrey Goldfine, KIRKLAND & ELLIS LLP, New York, New York; Richard Husseini & Leah Davis Patrick, KIRKLAND & ELLIS, Houston, Texas; *Counsel for Plaintiff and Counterclaim Defendant Darling Ingredients Inc.*

J. Clayton Athey & Robert B. Lackey, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Michael C. Whalen, PAUL HASTINGS LLP, Chicago, Illinois; *Counsel for Defendants and Counterclaim Plaintiffs*

**WILL, Vice Chancellor**

In May 2022, Darling Ingredients Inc. acquired Valley Proteins, LLC in a $1.1 billion transaction. The acquisition was made pursuant to a stock purchase agreement, which set out a dispute resolution process that includes the referral of certain matters to an accountant. Now, the parties are embroiled in a post-closing tax dispute and have reached an impasse over how the accountant should resolve it.

Because the acquisition created tax benefits for Darling, the total purchase price included a payment for an estimated tax benefit amount. The amount could be increased or decreased at closing using an agreed-upon tax model. Darling calculated a final tax benefit amount that was below the initial estimate, meaning that the sellers owed Darling the difference. The sellers then had 30 days to issue a protest notice challenging the calculation.

Although the stock purchase agreement permitted the sellers to send Darling an information request and toll the 30-day deadline, the sellers instead sent Darling a formal protest notice. Doing so launched the contractual dispute resolution process, which the parties followed for a time. It stalled when the accountant charged with resolving the tax dispute presented an engagement letter confining the scope of its work to the issues in raised in the sellers' protest notice.

Darling was willing to sign the engagement letter. But the sellers balked. They insisted that the accountant's review include a new set of disputes raised in a second protest notice the sellers had sent to Darling. The parties asked the

1

accountant to resolve the legal question of how the stock purchase agreement defines its role, but it declined. That task falls to me.

Darling filed suit in this court, and the sellers filed counterclaims. The parties cross-moved for summary judgment on whether the sellers must sign the accountant's engagement letter. The central question before me is whether the accountant's review is appropriately limited to matters raised in the seller's initial protest notice or expanded to include those raised later. In this decision, I conclude that the stock purchase agreement mandates the former outcome.

My reasoning is based on a straightforward contract interpretation exercise. The stock purchase agreement does not provide for multiple protest notices and restricts the scope of the accountant's review to matters raised in the protest notice (among other discrete items). Thus, the issues in dispute for the accountant to resolve are those in the seller's initial protest notice. The engagement letter proposed by the accountant is consistent with these terms and reasonable to resolve the tax dispute. Darling is entitled to declaratory relief consistent with these conclusions.

## I. FACTUAL BACKGROUND

Unless otherwise noted, the following background is drawn from the undisputed facts in the parties' pleadings and documentary exhibits submitted by the parties.

### A. The Acquisition

Darling Ingredients Inc. is a Delaware corporation that converts food waste streams into sustainable products and produces renewable energy.[1] On May 1, 2022, Darling acquired Valley Proteins, LLC through a stock purchase for $1.1 billion.[2] The transaction was governed by a Stock Purchase Agreement (the "Agreement") by and among Darling, on one hand, and Valley Proteins, the equity holders of Valley Proteins, and Gerald F. Smith, Jr. in his capacity as Sellers' Representative, on the other hand (collectively, the "Sellers").[3]

### B. The Tax Benefit Amount and Post-Closing Adjustment

In the transaction, Valley Proteins undertook a pre-closing "F" reorganization that created tax benefits for Darling.[4] Darling agreed to pay the Sellers a "Estimated Tax Benefit Amount," in addition to the $1.1 billion cash purchase price, for these

---

[1] Verified Compl. (Dkt. 1) ("Compl.") ¶ 4.

[2] Compl. ¶ 1; Defs.' Answer to Verified Compl. and Verified Countercls. (Dkt. 26) ("Answer") ¶ 1; *see* Compl. Ex. 1 ("SPA").

[3] Compl. ¶ 2. At times, the Sellers are referred to interchangeably with the Sellers' Representative.

[4] *Id.* at ¶ 10; Answer ¶ 10; *see* SPA § 5.5.

expected tax benefits.[5]  To calculate the Estimated Tax Benefit Amount, Darling

used an agreed-upon "Tax Model."[6]  Per the Tax Model, the Estimated Tax Benefit

Amount was initially calculated to be $92,600,000.[7]

The Estimated Tax Benefit Amount could be adjusted up or down after

closing.[8]  This post-closing adjustment would yield a "Closing Tax Benefit Amount"

that Darling would calculate using the Tax Model.[9]  Section 2.5(h) of the Agreement

contemplates two potential adjustments to the Tax Model when determining the

Closing Tax Benefit Amount.[10]  The first adjustment is to the purchase price based

on the Final Closing Schedule.  The second adjustment is to reflect the fair market

value of certain assets based on the values assigned in a jointly determined "Final

Allocation" of the Purchase Price.[11]  Specifically, the parties agreed that:

> Within three (3) days after the determination of the Final
> Allocation pursuant to Section 7.4(h), [Darling] shall prepare in
> good faith and deliver to Sellers' Representative a proposed
> calculation of the Tax Benefit Amount, which shall be
> determined after updating the Tax Model solely (A) for
> adjustments to the Purchase Price and any other item of
> consideration for income tax purposes, as determined pursuant to
> the Final Closing Schedule and (B) to reflect that the "FMV" for

---

[5] Compl. ¶ 11; *see* SPA § 2.2.

[6] SPA Ex. C.  The Tax Model is Exhibit C to the Agreement.  *Id.*

[7] Compl. ¶ 11.

[8] *Id.* at ¶ 13.

[9] *Id.* at ¶¶ 13-14; *see* SPA § 2.5(h).

[10] SPA § 2.5(h).

[11] *Id.*; *see id.* § 7.4(h); *infra* note 12 (defining "Final Allocation").

each of the Current and Non-Current Assets listed below the "Estimated Gain Calculation – Asset Sale" in the Tax Model shall be the value assigned to such assets in the Final Allocation (the "Closing Tax Benefit Amount").[12]

Section 2.5(h) also explains what the parties are to do if the Closing Tax Benefit Amount differs from the Estimated Tax Benefit Amount.[13] If the Estimated Tax Benefit Amount is greater than the Closing Tax Benefit Amount, then the Sellers are required to pay Darling the difference.[14] If the Estimated Tax Benefit Amount is less than the Closing Tax Benefit Amount, then Darling must pay the Sellers the difference.[15]

---

[12] SPA § 2.5(h). "Final Allocation" is defined as the "Agreed Allocation" "except in the case of any disputed items which the Sellers' Representative and [Darling] are unable to resolve as set forth in [] Section 7.4(h), in which case it shall mean the value assigned to such items in [Darling]'s Proposed Allocation." *Id.* § 7.4(h). "Agreed Allocation" refers to the agreed upon proposed allocation. *Id.* "Final Closing Schedule" is defined as "the Actual Closing Schedule if deemed final in accordance with Section 2.5(d) or the definitive Final Closing Schedule agreed to in writing by [Sellers] and [Darling] or resulting from the determinations made by the Accountants in accordance with [] Section 2.5(e)." *Id.* § 2.5(e). The "Actual Closing Schedule" refers to the schedule delivered by Darling to the Sellers that sets forth Darling's "good faith determination of (i) each item of Indebtedness outstanding as of immediately prior to the Closing, (ii) each Transaction Expense, (iii) Net Working Capital, (iv) Cash, and (v) the Actual Closing Amount resulting therefrom, in each case, together with reasonably detailed supporting or underlying documents for the calculation thereof." *Id.* § 2.5(b).

[13] *Id.* § 2.5(h)(i)-(ii).

[14] *Id.* § 2.5(h)(i).

[15] *Id.* § 2.5(h)(ii).

5

## C.     The Final Allocation

Section 7.4(h) of the Agreement effectively serves as a gating mechanism to Section 2.5(h) and Darling's calculation of the Closing Tax Benefit Amount.[16] The calculation of the Closing Tax Benefit Amount follows the Final Allocation of the purchase price, which the parties are to set pursuant to Section 7.4(h).[17] In relevant part, Section 7.4(h) provides:

> As soon as practicable and, in any event, within thirty (30) days following the final determination of the Final Closing Schedule pursuant to Section 2.5, [Darling] will provide to Sellers' Representative a proposed allocation of the Purchase Price (along with other items of consideration for United States federal Income Tax purposes) among the assets of the Acquired Companies in accordance with Section 1060 of the Code and consistent with a valuation report prepared for [Darling] by an independent, third-party valuation and appraisal firm with respect to the transactions contemplated by the Agreement ("Buyer's Proposed Allocation") along with relevant portions of such valuation report . . . .  If the Parties agree with respect to the allocation, such allocation shall be conclusive and binding on the Parties and the Parties agree not to take any position, in connection with any Tax Return, audit or similar proceeding related to Taxes, that is inconsistent with this Section 7.4(h) . . . For the purposes of this Agreement, the "Final Allocation" shall mean the Agreed Allocation . . . .[18]

If a dispute over Darling's "Proposed Allocation" of the purchase price arose, Darling and the Sellers' Representative would be obligated to negotiate in good faith

---

[16] *See id.* § 2.5(h).

[17] *Id.* § 7.4(h); *see supra* note 12 (defining Final Allocation).

[18] SPA § 7.4(h).

to reach agreement on a Final Allocation within 30 days of the Proposed Allocation's delivery.[19] Darling would use the Final Allocation in preparing the Closing Tax Benefit Amount.[20] Under Section 2.5(h), the calculation of the Closing Tax Benefit Amount is to be delivered to the Sellers' Representative within three days of determining the Final Allocation.[21]

### D. Delivery of the Proposed Allocation and the Closing Tax Benefit Amount

After closing, on October 14, 2022, Darling delivered its Proposed Allocation of the purchase price and Closing Tax Benefit Amount to the Sellers, along with native versions of spreadsheets detailing these calculations.[22] Section 7.4(h) of the Agreement required that Darling's Proposed Allocation be consistent with a valuation report by Houlihan Lokey—Darling's third-party valuation and appraisal firm.[23] Darling's calculation of the Proposed Allocation was the result of several adjustments: (1) to the Final Closing Schedule; (2) to the Tax Benefit Amount; (3) to

---

[19] *Id.*

[20] *See id.* § 2.5(h).

[21] *Id.*

[22] Transmittal Aff. of T. Brad Davey in Supp. of Pl.'s Answering Br. in Opp'n to Defs. and Countercl. Pls.' Mot. for Summ. J. (Dkt. 39) ("Davey Aff.") Exs. N, P. Darling provided the Closing Tax Benefit Amount with the Proposed Allocation, before the Final Allocation had been determined. *See* Davey Aff. Ex. N; *infra* notes 126-28 and accompanying text.

[23] SPA § 7.4(h); *see* Davey Aff. Ex. N.

the tax basis in the acquired assets and assumed liabilities; and (4) to reflect an indemnity escrow.[24]

Darling's calculations yielded a Closing Tax Benefit Amount of $63,568,000.[25] Since the Closing Tax Benefit Amount was less than the $92,600,000 Estimated Tax Benefit Amount, Darling asked that the Sellers pay it the $29,032,000 difference in accordance with Section 2.5(h)(i) of the Agreement.[26]

### E. The Dispute Resolution Process

Sections 2.5(c) to (e) and (h) of the Agreement set out a bargained-for process through which the parties request information and raise certain disputes to arrive at a final purchase price.[27] The dispute resolution process is brisk, with the entire process taking about 90 days.[28]

Sections 2.5(c) to (e) address disputes over the Actual Closing Schedule.[29] Section 2.5(h) incorporates the same process for disputes over the Closing Tax Benefit Amount.[30] In relevant part, Section 2.5(h) states:

> The Closing Tax Benefit Amount shall be reviewed by the
> Sellers' Representative and any dispute regarding the Closing

---

[24] Davey Aff. Ex. N at 1.

[25] *Id.*

[26] *Id.*; *see* SPA § 2.5(h)(i).

[27] *See* SPA §§ 2.5 (c)-(e), (h).

[28] Compl. ¶ 17.

[29] SPA §§ 2.5(c)-(e).

[30] *Id.* § 2.5(h).

Tax Benefit Amount shall be resolved either by [Darling] and Sellers' Representative or by the Accountants, in each case in accordance with the procedures set forth in Sections 2.5(c), (d) and (e).[31]

The process for resolving disputes over the Closing Tax Benefit Amount proceeds in several steps.

First, Section 2.5(c) provides that upon receipt of Darling's Closing Tax Benefit Amount, the Sellers may request additional, "reasonable" information to verify Darling's calculations.[32] Such requests could include "the [b]ooks and [r]ecords, work papers, trial balances and other materials relating to the [Closing Tax Benefit Amount]."[33] The Sellers could also, "to the extent reasonably necessary to complete their review of the [Closing Tax Benefit Amount]," ask to speak with "[Darling's] and [Valley Proteins'] personnel and accountants."[34]

Second, under Section 2.5(d), the Sellers' Representative may initiate the dispute resolution process by delivering a written protest notice to Darling raising any disagreement with the Closing Tax Benefit Amount.[35] The protest notice must include reasonable detail and documentation supporting the amount in dispute and

_____

[31] *Id.*

[32] *Id.* § 2.5(c).

[33] *Id.*

[34] *Id.*

[35] *Id.* § 2.5(d).

9

be delivered within 30 days of Darling serving its Closing Tax Benefit Amount calculation.[36] If a protest notice is not filed within 30 days of the Sellers receiving Darling's Closing Tax Benefit Amount calculation, then the Closing Tax Benefit Amount calculation "shall be final, binding, and non-appealable."[37] This 30-day window can be tolled if the "Sellers' Representative notifies [Darling] in writing" that Darling failed to comply with an information request under Section 2.5(c).[38]

Third, after a protest notice is timely delivered, Darling and the Sellers must "promptly endeavor in good faith to resolve any disagreement as to the [Closing Tax Benefit Amount]" under Section 2.5(e).[39] If the parties cannot reach agreement within 30 days of Darling receiving the protest notice, then the matter is transferred to Deloitte & Touche LLP for a final determination.[40] Deloitte's process is to be completed within 30 days and its decision is final and binding.[41]

The Agreement limits what Deloitte can consider when reaching its determination.[42] Section 2.5(e) states that Deloitte's review must be "based solely on the [Closing Tax Benefit Amount] and Protest Notice, together with all relevant

---

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.* § 2.5(e).

[40] *Id.*

[41] *Id.*

[42] *Id.*

10

supporting documentation, and any other clarifying presentations and submissions by [Darling] and Sellers' Representative as [Deloitte] may reasonably request . . . and not by independent review, only those amounts still in dispute."[43] The parties agreed in Section 2.5(e) "to execute, if requested by [Deloitte], a reasonable engagement letter."[44]

### F. The November Protest Notice and December "Amended" Protest Notice

On November 9, Grant Thornton, LLP (as the Sellers' accounting representative) delivered a letter to Darling (the "November Protest Notice") responding to Darling's October 14 calculations.[45] The letter was labeled "Protest Notice" and stated that it "constitute[d] a Protest Notice pursuant to section 2.5(d) of the Stock Purchase Agreement."[46]

The November Protest Notice concerned the Closing Tax Benefit Amount as calculated by Darling. More specifically, it disputed the calculation of the Proposed Allocation that, in turn, affected the Closing Tax Benefit Amount.[47] The November Protest Notice challenged Darling's gross-up calculation in connection with a

---

[43] *Id.*

[44] *Id.*

[45] Compl. Ex. 3 ("Nov. Protest Notice") at 1.

[46] *Id*.

[47] *Id.*

11

"section 199A deduction on the ordinary gain associated with the asset sale," additional federal income tax on the incremental asset gain, and additional state income tax on the deemed asset sale.[48]  It also disputed Darling's tax benefit calculation as it related to a "Tax Basis Step-Up" and an "Effective Corporate Tax Rate."[49]  The November Protest Notice closed by stating that the Sellers "reserve[d] the right to modify th[e] Protest Notice upon receipt and analysis of the information that ha[d] been requested from [Darling], but not yet provided, and any other information received from [Darling], including in connection with the discussion of the items set forth [therein]."[50]

On November 10, the Sellers requested additional information from Darling about the fair market value of acquired assets.[51]  The parties then met on November 16 to address the November Protest Notice and the Sellers' November 10 information request.[52]  Darling subsequently provided the Sellers with a "Fixed Asset Depreciation" detail file.[53]

---

[48] *Id.* at 2-3.

[49] *Id.* at 3.

[50] *Id.*

[51] Aff. of Jeffrey Alberty in Supp. of Defs. and Countercl. Pls.' Mot. for Summ. J. (Dkt. 34) ("Alberty Aff.") Ex. B at 1.  The fair market value of the assets requested on November 10 was the same allocation provided for in Section 7.4(h) of the SPA.

[52] Alberty Aff. ¶ 21.

[53] Davey Aff. Ex. R.  This file contained a list of Valley Proteins' fixed assets that were acquired by Darling as well as their acquisitions costs. *Id.* The parties disagree about whether the fixed asset depreciation detail file was necessary to calculate the Final

On December 1, Darling responded to the November Protest Notice and said that it would be unable to resolve the Sellers' contentions.[54] Darling explained that the Sellers had proposed "multiple formula changes inconsistent with the Stock Purchase Agreement, which specifically limit[ed] the [Closing] Tax Benefit Amount Adjustment solely to certain input changes to the Tax Model and not the Tax Model itself."[55]

On December 9—nearly two months after Darling submitted its Closing Tax Benefit Amount calculation to the Sellers—Grant Thornton sent Darling another letter on behalf of the Sellers identifying additional issues with the Closing Tax Benefit Amount (the "December Protest Notice").[56] The letter was labeled "Protest Notice."[57] It explained that the letter "constitute[d] an amendment to the Protest Notice provided November 8 [sic], 2022 pursuant to section 2.5(d) of the Stock Purchase Agreement."[58]

---

Allocation required under Section 7.4(h) and the subsequent Closing Tax Benefit Amount. This dispute is immaterial to the questions before me: whether the November Protest Notice was final and whether Deloitte's engagement letter was reasonable. *See infra* Sections II.A-B.

[54] Alberty Aff. Ex. D at 1.

[55] *Id.*

[56] Alberty Aff. Ex. E ("Dec. Protest Notice").

[57] *Id.* at 1.

[58] *Id.*

In the December Protest Notice, the Sellers disputed Darling's use of the Houlihan Lokey report (as opposed to the Final Closing Schedule) in adjusting the purchase price, tax basis, and net working capital.[59] They further questioned Darling's reduction in the amount of liabilities assumed and inclusion of the assets not sold in the tax basis calculation.[60] Grant Thornton stated that it was "ready to submit [its] comments to Deloitte . . . for consideration."[61]

In response, on January 12, Darling sent Grant Thornton a letter largely rejecting the arguments raised in both the November Protest Notice and the December Protest Notice.[62] Darling's letter included a revised calculation of the Closing Tax Benefit Amount that accounted for certain adjustments to the Tax Model.[63] Under this revised calculation, the Closing Tax Benefit Amount owed to

---

[59] *Id.* at 2-3.

[60] *Id.*

[61] *Id.* at 3.

[62] Alberty Aff. Ex. F ("Jan. 12 Letter").

[63] *Id.* at 2-3, 5-6. The parties disagree over the basis for Darling's revisions to the post-closing adjustments to the Closing Tax Benefit Amount calculation. Darling avers that this revised calculation was an "express settlement communication" that it hoped would resolve the dispute without need of court intervention. Pl.'s Opening Br. in Supp. of its Mot. for. Summ. J. (Dkt. 31) ("Darling's Opening Br.") 14 n.5. The Sellers contend that these changes were based on the November Protest Notice and December Protest Notice, and included modifications to the formula used for the tax basis attributable to the assets acquired from the Sellers. *See* Defs. & Countercl. Pls.' Opening Br. in Supp. of their Mot. for Summ. J. (Dkt. 33) ("Sellers' Opening Br.") 13. This dispute does not affect the central questions before me, which are whether the November Protest Notice was final and whether Deloitte's engagement letter was reasonable. *See infra* Sections II.A-B.

Darling would be reduced from $29,032,000 to $20,797,000.[64] Darling further advised the Sellers that if the parties could not agree on a Closing Tax Benefit Amount by January 18, then it would engage Deloitte to resolve the matter in accordance with Sections 2.5(e) and (h).[65]

## G. The Engagement Letter

The parties were unable to resolve their disagreement over the Closing Tax Benefit Amount by January 18. At that point, Darling referred the dispute to Deloitte for a final determination.[66] Darling purported to do so on behalf of both parties.

On February 14, after reviewing the Agreement and completing a conflicts check, Deloitte agreed to accept the matter if the parties signed an engagement letter.[67] Deloitte sent the parties a draft engagement letter (the "February Engagement Letter") stating that, "[a]s provided by Section 2.5(e) of the Agreement," Deloitte had been asked "to act as an expert to resolve [the] disagreements."[68] The February Engagement Letter explained that Deloitte would "consider only those specific items of disagreement identified by the Seller in its

---

[64] Jan. 12 Letter 2.

[65] *Id.* at 7.

[66] Compl. ¶ 21; Transmittal Aff. of J. Clayton Athey in Supp. of Defs. & Countercl. Pls.' Opening Br. in Supp. of their Mot. for Summ. J. (Dkt. 34) ("Athey Aff.") Ex. 2 at 7.

[67] Answer ¶ 23; Athey Aff. Ex. 2 at 3-4.

[68] Compl. Ex. 4 at 2.

Protest Notice; other amounts and issues related to the Closing Tax Benefit Amount having been accepted by the Seller[s] are considered settled, final, and binding on the Parties."[69]

Darling agreed to sign the February Engagement Letter. The Sellers, however, refused and requested substantive changes.[70] Darling and the Sellers then negotiated proposed modifications to the February Engagement Letter.[71] In March 29 correspondence, the parties asked that "Deloitte resolve as a prefatory issue the scope of what Deloitte may consider under the Agreement in resolving the dispute and provide that scope determination to the parties."[72]

Deloitte rejected this proposed change to the February Engagement Letter.[73] It explained that the revision called for "a legal determination . . . outside the scope of the work Deloitte can perform."[74] Deloitte provided a revised proposed engagement letter on April 14 (the "April Engagement Letter").[75]

---

[69] *Id.* at 4.

[70] *See* Athey Aff. Ex. 2 at 1.

[71] *Id.*

[72] *Id.*

[73] Compl. ¶ 27; Answer ¶ 27.

[74] Athey Aff. Ex. 2 at 1.

[75] Compl. ¶ 27; Answer ¶ 27; Compl. Ex. 5 ("Apr. Engagement Letter").

Again, Darling agreed to sign the April Engagement Letter.[76] But the Sellers refused, maintaining that the letter did not correspond with the terms of Section 2.5(h). In the Sellers' view, the April Engagement Letter unreasonably limits Deloitte's review to Darling's calculation of the Closing Tax Benefit Amount and the November Protest Notice.[77] Separately, on May 2, Sellers asserted (for the first time) that the deadline to submit a protest notice under Section 2.5(d) had been tolled.[78] Thus, the parties reached an impasse.

## H. The Litigation

On June 13, 2023, Darling filed a three-count Verified Complaint against the Sellers in this court.[79] Count I of the complaint is a claim for breach of contract against the Sellers for refusing to sign the April Engagement Letter.[80] Count II seeks a declaration that the April Engagement Letter conforms to the Agreement and is reasonable under Section 2.5(e).[81] Count III is a claim for costs, expenses, and fees

---

[76] Compl. ¶ 28.

[77] Transmittal Aff. of Callan R. Jackson in Supp. of Pl.'s Opening Br. in Supp. of its Mot. for Summ. J. (Dkt. 31) ("Jackson Aff.") Ex. J at 3-4.

[78] Jackson Aff. Ex. H at 2-3.

[79] Dkt. 1.

[80] Compl. ¶¶ 32-36. Although Darling initially requested that I order the Sellers to specifically perform under Section 2.5(e) by signing an engagement letter, it conceded that declaratory relief would be adequate. Tr. of Sept. 6, 2023 Oral Arg. on Mots. for Summ. J. ("Hr'g Tr.") 28.

[81] Compl. ¶¶ 37-43.

in litigating this action, including reasonable attorneys' fees, pursuant to Section 10.17 of the Agreement.[82]

On June 30, the Sellers answered the complaint, raising several affirmative defenses.[83] The Sellers also advanced counterclaims against Darling for breach of contract for failing to provide information under Section 2.5(c) and for "insisting that [the] Sellers execute a patently unreasonable engagement letter with Deloitte."[84] The Sellers seek declaratory relief, along with attorneys' fees and costs under Section 10.17 of the SPA.[85] On July 14, Darling answered the Sellers' counterclaims.[86]

On August 3, 2023, Darling filed a motion for summary judgment and the Sellers cross-moved for summary judgment.[87] After briefing was complete, the cross-motions were argued on September 6.[88] The motions were taken under advisement at that time.

---

[82] *Id.* ¶¶ 44-46.

[83] Dkt. 26.

[84] Answer 30.

[85] *Id.* at 30-32.

[86] Dkt. 28.

[87] Dkts. 31-33.

[88] Dkts. 43, 46.

## II.    ANALYSIS

Under Court of Chancery Rule 56, summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[89] "[T]he facts must be viewed in the light most favorable to the nonmoving party and the moving party has the burden of demonstrating that there is no material question of fact."[90] "In evaluating cross-motions for summary judgment, the court must examine each motion separately and only grant a motion for summary judgment to one of the parties when there is no disputed issue of material fact and that party is entitled to judgment as a matter of law."[91]

The parties' arguments involve two interrelated issues: (1) whether the November Protest Notice is final; and (2) whether the April Engagement Letter is reasonable.  If the November Protest Notice is final, then Deloitte's review is appropriately limited to the disputes raised in that notice, as set out in the April Engagement Letter.  But if the November Protest Notice is not final and the Sellers were permitted to raise additional disputes (such as those in the December Protest

---

[89] Ct. Ch. R. 56 (c).

[90] *Senior Tour Players 207 Mgmt. Co. v. Golftown 207 Hldgs. Co.*, 853 A.2d 124, 126 (Del. Ch. 2004).

[91] *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 166-67 (Del. Ch. 2003) (citation omitted).

19

Notice), then the appropriate scope of Deloitte's review might be broader than the April Engagement Letter contemplates. The resolution of these issues turns on the plain terms of the Agreement.

Matters of contract interpretation presenting questions of law may be amendable to resolution through summary judgment.[92] "In cases involving questions of contract interpretation, a court will grant summary judgment under either of two scenarios: when the contract in question is unambiguous, or when the extrinsic evidence in the record fails to create a triable issue of material fact."[93] The former scenario applies to the present motions.

For the reasons explained below, I conclude that Darling is entitled to summary judgment in its favor. The November Protest Notice is final. It follows that the April Engagement Letter is reasonable.

### A.    Whether the November Protest Notice Is Final

Upon Darling's October 14 delivery of its Closing Tax Benefit Amount calculation, Section 2.5(d) of the Agreement gave the Sellers a choice. The Sellers could either accept Darling's calculation or engage in the dispute resolution process provided for in the Agreement. They chose the latter.

---

[92] *See, e.g.*, *Barton v. Club Ventures Invs. LLC*, 2013 WL 6072249, at *5 (Del. Ch. Nov. 7, 2013); *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 478 (Del. 1991).

[93] *GRT, Inc. v. Marathon GTF Tech., LTD.*, 2012 WL 2356489, at *4 (Del. Ch. June 21, 2012) (citation omitted).

In doing so, the Sellers had a second choice to make. They could, under Section 2.5(d), submit a protest notice within 30 days of receiving the calculation.[94] Or they could invoke the Agreement's tolling mechanism by giving Darling written notice that Darling failed to satisfy a request for access to documentation or personnel under Section 2.5(c).[95] The Sellers chose the former when they delivered the November Protest Notice.

Darling maintains that, as a result of these choices, the Sellers can only challenge issues raised in their November Protest Notice.[96] The Sellers reject this outcome and dispute the finality of the November Protest Notice on two alternative grounds.[97] First, the Sellers argue that the Agreement permits multiple protest notices.[98] And second, they aver that—even if the Agreement permits a single protest notice—their time to provide a final protest notice was tolled because Darling failed to respond to an information request.[99]

---

[94] SPA § 2.5(d).

[95] *Id.* §§ 2.5(c)-(d).

[96] Darling's Opening Br. 4-6.

[97] Sellers' Opening Br. 2-3.

[98] *Id.* at 2.

[99] *Id.* at 3.

### 1.    Section 2.5 Contemplates a Single Protest Notice.

Section 2.5(h) of the Agreement sets out a process for resolving disputes over the calculation of the Closing Tax Benefit Amount.  Specifically, it provides that any such dispute "shall be resolved either by [Darling] and Sellers' Representative or by the Accountants, in each case in accordance with the procedures set forth in Sections 2.5(c), (d), and (e)."[100]   Section 2.5(h) thereby incorporates the steps and time limitations addressed in Sections 2.5(c) to (e) (regarding a "Tax Benefit Dispute") into the resolution of a dispute over the Closing Tax Benefit Amount.

Darling asserts that these steps and their associated time limits were triggered when the Sellers delivered the November Protest Notice.  The Sellers, however, argue that Section 2.5(h) allows them to raise any dispute about the Closing Tax Benefit Amount at any time.[101]  As the Sellers read the Agreement, they are free to raise multiple protest notices.[102]  Their reasoning fails for several reasons.

First, the Sellers' argument that Section 2.5(h) permits multiple or amended protest notices is belied by the Agreement's terms.  Section 2.5(d) states that "[w]ithin thirty (30) days following delivery of the [Closing Tax Benefit Amount], [Sellers] may deliver written notice (the 'Protest Notice') to [Darling] of any

---

[100] SPA § 2.5(h).

[101] Sellers' Opening Br. 18-19.

[102] *See id.* at 16-21.

disagreement that Sellers[] . . . may have as to the [Closing Tax Benefit Amount]."[103]
The only logical reading of this provision is that a single protest notice is contemplated—as denoted by the use of the definite article "the" before the defined, singular term "Protest Notice."[104] The Agreement makes no mention of an "amended" protest notice or plural protest notices. To graft a provision stating otherwise onto the Agreement would be inconsistent with basic rules of contract interpretation.[105]

Nonetheless, the Sellers contend that the Agreement does not constrain their ability to raise disagreements with the Closing Tax Benefit Amount calculation beyond those in the November Protest Notice.[106] They argue that the "any dispute" language in Section 2.5(h) "places specific modifications and limitations on [the]

---

[103] SPA § 2.5(d).

[104] *See ION Geophysical Corp. v. Fletcher Int'l, Ltd.*, 2010 WL 4378400, at *7 (Del. Ch. Nov. 5, 2010) ("The definite article 'the' is generally used as a function word to indicate that a following noun or noun equivalent is definite . . . [or] unique or a particular member of its class . . . The word 'a' is an indefinite article used as a function word before singular nouns when the referent is unspecified . . . [and] does not necessarily limit the frequency or duration of that noun."). The Sellers' counsel conceded this point during oral argument. Hr'g Tr. 46 ("The protest notice is referred to in the singular in the SPA. We're not going to run from that. That's what it says.").

[105] *See Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) ("When interpreting a contract, [the] Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement." (quoting *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012))); *Alchemy LTD LLC v. Fanchise League Co., LLC*, 2023 WL 4670954, at *5 (Del. Ch. July 20, 2023) ("A court will not look beyond the four corners of an agreement if a contract is unambiguous.").

[106] *See* Sellers' Opening Br. 16-21.

incorporation of Section[s] 2.5(c)-(e)."[107]  For example, the Sellers assert that the dispute resolution process outlined in Sections 2.5(c) to (e) operates differently when applied to the Closing Tax Benefit Amount rather than to other Section 2.5 purchase price adjustments.[108]

The Sellers' reading is inconsistent with the plain text of Section 2.5(h).[109] Section 2.5(h) states that disputes over the Closing Tax Benefit Amount will be resolved "in accordance with the procedures set forth in Sections 2.5 (c), (d), and (e)."[110]  There is no carveout in Section 2.5(h) for the delineated time limitations in raising and resolving issues described in these provisions.[111]  Similarly, nothing in Sections 2.5(c) to (e) (or elsewhere in the Agreement) prescribes a different resolution process when the dispute involves the Closing Tax Benefit Amount.

The Sellers also aver that the "specific terms" of Section 2.5(h) (i.e., "any dispute"; "in each case") qualify the "general terms" in Sections 2.5(c) to (e),

---

[107] *Id.* at 7.

[108] *See id.*

[109] *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006) ("When interpreting a contract, the role of a court is to effectuate the parties' intent. In doing so, [a court is] constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended.").

[110] SPA § 2.5(h).

[111] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) ("Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning.").

24

supporting the modification of Section 2.5's dispute resolution process.[112]  The

canon of construction this argument draws upon might matter if the provisions

conflicted.[113]  There is no conflict, however.  Section 2.5(h) is expressly qualified

by the terms of Sections 2.5(c) to (e).

Finally, the Sellers' interpretation of Section 2.5(h) as it relates to the dispute

resolution process outlined in Sections 2.5(c) to (e) would lead to an absurd result.[114]

According to the Sellers, "any dispute" over the Closing Tax Benefit Amount can

be resolved under Section 2.5(c)—regardless of the procedural steps and time

limitations specified in Sections 2.5(c) to (e).[115]  This interpretation would permit

the Sellers to submit unlimited disputes, rendering meaningless the requirements and

timeline in Sections 2.5(c) to (e).  Theoretically, that could result in a looping and

---

[112] Sellers' Opening Br. 17-18.

[113] *See, e.g.*, *ITG Brands, LLC v. Reynolds Am., Inc.*, 2017 WL 5903355, at *9 (Del. Ch. Nov. 30, 2017) ("The rule of contractual interpretation that a 'specific provision ordinarily qualifies the meaning of [a] general one' logically applies where 'specific and general provisions conflict.'  But there is no necessary conflict here."); *Sunline Com. Carriers, Inc. v. CITGO Petroleum, Corp.*, 206 A.3d 836, 846 (Del. 2019) ("[G]eneral terms of the contract must yield to more specific terms."); *DCV Hldgs., Inc v. ConAgra, Inc.*, 889 A.2d 954, 961 (Dec. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").

[114] *See ITG Brands*, 2017 WL 5903355, at *12 ("Delaware courts avoid adopting '[a]n unreasonable interpretation [that] produces an absurd result or one that no reasonable person would have accepted when entering the contract.'" (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010))).

[115] *See* Sellers' Opening Br. 18.

never-ending dispute resolution process and an unfinalized Closing Tax Benefit Amount. Such a result would frustrate the broader purpose of Section 2.5, which lays out an efficient, multi-step process to resolve disagreements over purchase price adjustments within approximately 90 days.[116]

### 2. The Protest Notice Deadline Was Not Tolled.

Section 2.5(d) of the Agreement requires that the Sellers' Representative submit any protest notice within 30 days of Darling's delivery of its Closing Tax Benefit Amount calculation.[117] This deadline may be tolled if the "Sellers' Representative notifies [Darling] in writing that it has failed to comply with Section 2.5(c)."[118] The period then remains tolled "during any time that it is reasonably determined that [Darling] fails to comply with Section 2.5(c)."[119]

The Sellers opted not to make an information request before sending their November Protest Notice. It was not until May 2, 2023—nearly six months after the November Protest Notice—that the Sellers raised Darling's purported non-

---

[116] *See Bardy Diagnostics, Inc. v. Hill-Rom, Inc.*, 2021 WL 2886188, at *18 (Del. Ch. July 9, 2021) ("When undertaking to construe a contract, our Supreme Court has instructed that the trial court must consider '[t]he basic business relationship between [the] parties' so that it can 'give sensible life' to the agreement." (quoting *Chi. Bridge & Iron Co. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926-27 (Del. 2017))).

[117] SPA § 2.5(d); *see supra* note 36-38 and accompanying text.

[118] SPA § 2.5(d).

[119] *Id.*

compliance with Section 2.5(c) and associated tolling.[120] By then, the parties had already taken steps in the dispute resolution process and Deloitte had delivered the April Engagement Letter.[121]

Section 2.5 differentiates between a protest notice and an information request.[122] Each mechanism serves a distinct, yet related, function in the dispute resolution process. A request for access to information under Section 2.5(c) would allow the Sellers to gain the materials necessary to verify the Closing Tax Benefit Amount calculation. If Darling did not provide Sellers with reasonable access to the requested documentation or personnel, the Sellers could invoke (in writing) the tolling mechanism in Section 2.5(d).[123] Doing so would protect the Sellers from moving forward with a protest notice without first receiving the information needed to verify Darling's calculations. But the Sellers did not avail themselves of that protection and opted, instead, to press ahead with the November Protest Notice.

---

[120] Jackson Aff. Ex. H at 2-3.

[121] *See supra* Sections I.F-G; Compl. ¶¶ 21, 23, 26-27; Answer ¶¶ 23, 26-27.

[122] SPA § 2.5(d) ("Sellers' Representative may deliver written notice (the 'Protest Notice') to [Darling] of any disagreement that Sellers' Representative may have as to the [Closing Tax Benefit Amount] setting forth in reasonable detail (and providing reasonable documentation supporting) the amount(s) in dispute; provided, however, that in the event Sellers' Representative notifies [Darling] in writing that it has failed to comply with Section 2.5(c), such thirty (30) day period shall toll . . . .").

[123] *See id.* §§ 2.5(c)-(d).

The Sellers now aver that the November Protest Notice operated as both a formal protest notice and a request for information under Section 2.5(c) that tolled the protest notice deadline in Section 2.5(d).[124] This argument is flawed. It would be illogical for an information request in a protest notice to toll the deadline to serve a protest notice.[125]

*      *      *

Neither party has followed the Agreement to the letter. For example, Darling submitted its calculation of the Closing Tax Benefit Amount before the Final Allocation was determined, instead of three days after such determination pursuant to Section 2.5(h). The parties dispute whether the calculations and asset allocations that Darling subsequently provided in a spreadsheet were relevant to the Closing Tax

---

[124] *See* Sellers' Opening Br. 22.

[125] *See* SPA §§ 2.5(c)-(d). The Sellers further argue that their statement in the November Protest Notice "reserv[ing] the right to modify th[e] [November] Protest Notice upon receipt and analysis of the information that ha[d] been requested from [Darling], but not yet provided," served as a Section 2.5(c) information request. Sellers' Opening Br. 22; Nov. Protest Notice 3. They analogize the statement to a books and records request under 8 *Del. C.* § 220, which they aver is proper without specific reference to the statute. Sellers' Opening Br. 25 (citing *NVIDIA Corp. v. City of Westland Police & Fire Ret. Sys.*, 282 A.3d 1, 13-14 (Del. 2022)). Setting aside the merits of the argument, it is irrelevant here. The notice requirements at issue are contractually specified in an agreement negotiated between sophisticated parties. *E.g.*, *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *60 (Del. Ch. Oct. 1, 2018) ("It is not the court's role to rewrite the contract between sophisticated market participants, allocating the risk of an agreement after the fact, to suit the court's sense of equity or fairness."), *aff'd*, 198 A.3d 724 (Del. 2018).

28

Benefit Amount.[126] But the Sellers forewent further negotiations of Darling's Proposed Allocation for purposes of Section 2.5(h) when they submitted the November Protest Notice.[127] In other words, by submitting their November Protest Notice challenging the Closing Tax Benefit Amount, the Sellers effectively treated Darling's Proposed Allocation as the Final Allocation for purposes of Section 2.5(h).[128]

---

[126] On November 17, Darling provided the Sellers with a spreadsheet containing a list of 11,503 fixed assets Darling acquired from the Sellers and the fair market value that had been assigned to each fixed asset. Davey Aff. Ex. R. Darling asserts that this spreadsheet has no relevance to the calculation of the Closing Tax Benefit Amount and was instead delivered to the Sellers so that they could prepare their tax returns. Pl.'s Answering Br. in Opp'n to Defs. and Countercl. Pls.' Mot. for Summ. J. (Dkt. 39) 5. The Sellers disagree and contend that the November 17 spreadsheet "provided critical information regarding Purchase Price allocations" that was necessary for the Sellers to verify the Closing Tax Benefit Amount. Sellers' Opening Br. 23, 26. The Sellers further assert that the December Protest Notice is permissible because the 30-day window to deliver a protest notice did not begin to run until November 17 when the spreadsheet was delivered. *Id.* at 26.

[127] That is not to say that the Sellers relinquished their ability to dispute the Proposed Allocation for purposes of Section 7.4(h) or to adopt "their own positions regarding the allocation of the Purchase Price among the assets of the Acquired Companies for tax purposes." SPA § 7.4(h).

[128] I note that Section 10.2 of the Agreement contains a non-waiver provision. SPA § 10.2 ("Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party, or in the case of a waiver, by the Party against whom the waiver is to be effective."). Regardless, the Sellers' actions post-execution need not be overlooked. *See Pepsi-Cola Bottling Co. of Asbury Park v. PepsiCo, Inc.,* 297 A.2d 28, 33 (Del. 1972) (concluding that the parties' post-contract behavior effectively changed the operation of the written agreement, notwithstanding anti-waiver language). The Sellers initiated the dispute resolution process under Section 2.5(h) to challenge Darling's calculation of the Closing Tax Benefit Amounts, despite the Final Allocation not being formally determined.

29

Delivery of the November Protest Notice had other consequences. The Sellers declined to exercise their right to pursue a pre-protest notice information request that could toll the protest notice deadline if the request remained unfulfilled. Instead, they triggered the next steps in the bargained-for dispute resolution process outlined in the Agreement.[129] Although the Sellers might now regret their hasty choice, the Agreement does not grant them a protest notice do-over. Neither will I.

## B. Whether Deloitte's Engagement Letter Is Reasonable

The Agreement delegates the resolution of the Closing Tax Benefit Amount to "the Accountants"—i.e., Deloitte—who "shall act as an expert (and not an arbitrator)."[130] This language is clear and unambiguous.[131] Deloitte's review is

---

[129] The SPA does not provide for an "amended" Protest Notice. *See* Section II.A.1. Therefore, the Sellers' November Protest Notice was final and the tolling provision of Section 2.5(d) become moot when the November Protest Notice was sent.

[130] SPA § 2.5(e).

[131] *See, e.g.*, *Penton Bus. Media Hldgs., LLC v. Informa PLC*, 252 A.3d 445, 465 (Del. Ch. 2018) ("The parties evinced their clear intent in the Dispute Resolution Provision by using 'expert not arbitrator' language. The Dispute Resolution Provision does not contain any features that might render this language ambiguous."); *Chi. Bridge*, 166 A.3d at 931 (explaining that "expert not arbitrator" language "by itself has been read to narrow the scope of the expert's domain" and "further limited the scope of the [expert's] review even in the limited situations where it was empowered to review anything").

confined to the narrow technical question delegated to it—not a legal dispute over contract interpretation.[132]

Section 2.5(e) of the Agreement enumerates the information Deloitte may consider in resolving the parties' Closing Tax Benefit Amount disagreement.[133] It is permitted to resolve "only those amounts still in dispute."[134] And its determination must be "based solely on the [Closing Tax Benefit Amount] and Protest Notice, together with all relevant supporting documentation, and any other clarifying presentations and submissions by [Darling] and Sellers' Representative as [Deloitte] may reasonably request."[135]

Darling contends that the April Engagement Letter proposed by Deloitte is reasonable because it is consistent with the bounds of what Deloitte can consider under Section 2.5(e).[136] The Sellers, for their part, argue that Deloitte's review should be broadened to include "any dispute," including those raised after the

---

[132] *See Penton*, 252 A.3d at 465 ("Holding that the Dispute Resolution Provision calls for an expert determination means that the contract itself determines the scope of the expert's jurisdiction. Where the parties have entrusted the power of decision to an expert, the extent of the expert's jurisdiction depends on the terms of the contract between the parties.") (citation omitted).

[133] SPA § 2.5(e).

[134] *Id.*

[135] *Id.*

[136] Darling's Opening Br. 6.

31

November Protest Notice.[137] The Sellers also insist that the April Engagement Letter is unreasonable because it contains terms not contemplated by the Agreement.[138]

The April Engagement Letter is appropriately limited to the matters presented in the November Protest Notice, consistent with the Agreement's terms. As noted above, the Agreement does not provide for multiple or amended notices.[139] Rather, it delineates steps to resolve disputes involving the Closing Tax Benefit Amount after a protest notice is served. The Sellers' remorse over the November Protest Notice they cast does not allow them to unilaterally expand the universe of what Deloitte may consider.

Although the language of the April Engagement Letter is not identical to the Agreement, the two track in all material respects.[140] The April Engagement Letter references and incorporates Section 2.5(h).[141] It also states that "other amounts and issues related to the Closing Tax Benefit Amount having been accepted by Sellers[]

---

[137] *See* Sellers' Opening Br. 18.

[138] *Id.* at 28-29.

[139] *See supra* Section II.A.1.

[140] *Compare* SPA § 2.5(e), *with* Apr. Engagement Letter 2-4.

[141] Apr. Engagement Letter 1 ("The Tax Benefit Amount was prepared by [Darling] . . . and delivered, pursuant to Section 2.5(h) of the Agreement, to Sellers[] . . . on October 14, 2022."). The Sellers contend that the absence of Section 2.5(h)'s "any dispute" language in the April Engagement Letter makes it makes it per se unreasonable. *See* Sellers' Opening Br. 28-29; SPA § 2.5(h). But this language does not modify the scope of the dispute resolution steps specified in Sections 2.5(c) to (e). *See supra* Section II.A.1.

32

. . . are considered settled, final, and binding on the Parties."[142] This is consistent with the "only those amounts in dispute" language of Section 2.5(e).[143] Section 2.5(e) expressly permits Deloitte to consider Darling's calculation of the Closing Tax Benefit Amount and the protest notice (i.e., the November Protest Notice) when resolving disputes over the Closing Tax Benefit Amount. Accordingly, any other matters are deemed final and settled for purposes of Section 2.5(e).[144]

The Sellers "agree[d] to execute, if requested by the Accountants, a reasonable engagement letter."[145] The Agreement defines the ambit of Deloitte's engagement. Consistent with the Agreement, the April Engagement Letter is limited to the amounts in dispute based on Darling's calculation of the Closing Tax Benefit Amount and the November Protest Notice.[146] The April Engagement Letter is

---

[142] Apr. Engagement Letter 4.

[143] SPA § 2.5(e) ("The Accountants shall act as an expert . . . to determine, based solely on the [Closing Tax Benefit Amount] and Protest Notice, together with all relevant supporting documentation, and any other clarifying presentations and submissions by [Darling] and Sellers[] . . . as [Deloitte] may reasonably request . . . and not by independent review, only those amounts in dispute[.]").

[144] *Id.*; *see Penton*, 252 A.3d at 467-69 (limiting an accountant to reviewing "the language of the contract and operative accounting and tax principles," consistent with the "plain and unambiguous" terms of the agreement).

[145] SPA § 2.5(e).

[146] *Compare id.*, *with* Apr. Engagement Letter 4 ("[Deloitte] will consider only those specific items of disagreement identified by the Sellers' Representative in its Protest Notice; other amounts and issues related to the Closing Tax Benefit Amount having been accepted by the Sellers' Representative are considered settled, final, and binding on the Parties.").

therefore reasonable under Section 2.5(e) of the Agreement.[147]  Darling is entitled to

a declaration to that effect.[148]

## C.    Whether Darling Is Entitled to Fees and Costs

Section 10.17 of the Agreement entitles a prevailing party in a lawsuit

regarding the Agreement to recover its reasonable attorneys' fees and costs.

Specifically, Section 10.17 states:

> In the event of any Suit in connection with this Agreement or any
> Ancillary Document, the prevailing Party in any such Suit shall
> be entitled to recover from the other Parties its costs and
> expenses incurred in connection with investigating, preparing,
> prosecuting, determining and/or settling such Suit, including
> reasonable legal fees and expenses.[149]

Darling has prevailed in this action and is receiving declaratory relief in its favor.  It

is therefore entitled to its reasonable attorneys' fees and costs incurred in pressing

---

[147] The Sellers cite *Mehiel v. Solo Cup Co.* for the proposition that Delaware courts should refrain from making reasonableness determinations at the summary judgment stage.  2005 WL 1252348, at *8 (Del. Ch. May 13, 2005).  This argument mischaracterizes the precedent.  In *Mehiel*, the court denied the seller representative's request to order the buyer to sign a "reasonable engagement letter" because: (i) the court lacked jurisdiction as the parties' agreement stipulated that the disputes would be resolved by an arbitrator; and (ii) specific performance was unavailable as the court would have to supply "essential terms to the contract" given the parties' failure to "define for themselves the most basic guidelines for this arbitration." *Id.* at 7-8.  The present case is distinguishable from *Mehiel* for at least two reasons.  First, because Deloitte is serving as an expert and not an arbitrator, I am empowered to determine the scope of Deloitte's review.  Second, I need not supply essential terms because the dispute resolution process and scope of Deloitte's review are specified in the Agreement.

[148] *See Penton*, 252 A.3d at 470 (declaring that the expert accountant's engagement was limited to the scope provided in a dispute resolution provision).

[149] SPA § 10.17.

its claims.[150] Darling shall submit an affidavit outlining its reasonable fees and costs, to which the Sellers can respond before the amount of fees to be awarded is set.

## III.    CONCLUSION

Darling's motion for summary judgment is granted.  The April Engagement Letter is reasonable under Section 2.5(e) of the Agreement.  The Sellers' cross-motion for summary judgment is denied.  The parties are to confer on a proposed form of implementing order and submit it within seven days.

---

[150] *See Comrie v. Enterasys Networks, Inc.*, 2004 WL 936505, at *5 (Del. Ch. Apr. 27, 2004) (awarding the prevailing party costs and fees under a fee shifting provision in a stock purchase agreement).